# SMITH, CORRECTIONAL SUPERINTENDENT *v.* PHILLIPS

No. 80–1082.   Argued November 9, 1981—Decided January 25, 1982

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 221. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 224.

*Robert M. Pitler* argued the cause for petitioner. With him on the briefs were *Mark Dwyer* and *Vivian Berger.*

*William M. Kunstler* argued the cause for respondent. With him on the briefs was *C. Vernon Mason.**

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent was convicted in November 1974 by a New York state-court jury on two counts of murder and one count of attempted murder. After trial, respondent moved to vacate his conviction pursuant to § 330.30 of the N.Y. Crim. Proc. Law (McKinney 1971) (CPL),[1] and a hearing on his mo-

---

**Charles S. Sims, Bruce J. Ennis, Jr.*, and *Richard M. Zuckerman* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] Section 330.30 provides in pertinent part:

"At any time after rendition of a verdict of guilty and before sentence,

tion was held pursuant to CPL § 330.40.[2]  The hearing was held before the justice who presided at respondent's trial, and the motion to vacate was denied by him in an opinion concluding "beyond a reasonable doubt" that the events giving rise to the motion did not influence the verdict.  *People* v. *Phillips*, 87 Misc. 2d 613, 614, 630, 384 N. Y. S. 2d 906, 907–908, 918 (1975).  The Appellate Division of the Supreme Court, First Judicial Department, affirmed the conviction without opinion.  52 App. Div. 2d 758, 384 N. Y. S. 2d 715 (1976).  The New York Court of Appeals denied leave to appeal.  39 N. Y. 2d 949, 352 N. E. 2d 894 (1976).

Some four years after the denial of leave to appeal by the Court of Appeals, respondent sought federal habeas relief in the United States District Court for the Southern District of New York on the same ground which had been asserted in the state post-trial hearing.  The District Court granted the writ, 485 F. Supp. 1365 (1980), and the United States Court of Appeals for the Second Circuit affirmed on a somewhat different ground.  632 F. 2d 1019 (1980).  We granted certiorari to consider the important questions of federal constitutional law in relation to federal habeas proceedings raised by these decisions.  450 U. S. 909 (1981).  We now reverse.

---

the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds:

.        .        .        .        .

"2. That during the trial there occurred, out of the presence of the court, improper conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict . . . ."

[2] CPL § 330.40 provides that motions to set aside the verdict under CPL § 330.30 must be decided by hearing if they allege disputed facts sufficient to grant the motion.  At the hearing, "the defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion."  CPL § 330.40(g).

# I

## A

Respondent's original motion to vacate his conviction was based on the fact that a juror in respondent's case, one John Dana Smith, submitted during the trial an application for employment as a major felony investigator in the District Attorney's Office.[3] Smith had learned of the position from a friend who had contacts within the office and who had inquired on Smith's behalf without mentioning Smith's name or the fact that he was a juror in respondent's trial. When Smith's application was received by the office, his name was placed on a list of applicants but he was not then contacted and was not known by the office to be a juror in respondent's trial.

During later inquiry about the status of Smith's application, the friend mentioned that Smith was a juror in respondent's case. The attorney to whom the friend disclosed this fact promptly informed his superior, and his superior in turn informed the Assistant District Attorney in charge of hiring investigators. The following day, more than one week before the end of respondent's trial, the assistant informed the two attorneys actually prosecuting respondent that one of the jurors had applied to the office for employment as an investigator.

The two prosecuting attorneys conferred about the application but concluded that, in view of Smith's statements during *voir dire*,[4] there was no need to inform the trial court or de-

---

[3] Smith's letter of application was addressed to the District Attorney and stated:

"I understand that a federally funded investigative unit is being formed in your office to investigate major felonies. I wish to apply for a position as an investigator."

The letter did not mention that Smith was a juror in respondent's trial. Appended to the letter was a resumé containing biographical information about Smith. *People* v. *Phillips*, 87 Misc. 2d 613, 616, 384 N. Y. S. 2d 906, 909 (1975).

[4] The trial judge described the *voir dire* in respondent's case as "ten days of meticulous examination." *Id.*, at 614, 384 N. Y. S. 2d, at 907. During

fense counsel of the application. They did instruct attorneys in the office not to contact Smith until after the trial had ended, and took steps to insure that they would learn no information about Smith that had not been revealed during *voir dire*. When the jury retired to deliberate on November 20th, three alternate jurors were available to substitute for Smith, and neither the trial court nor the defense counsel knew of his application. The jury returned its verdict on November 21st.

The District Attorney first learned of Smith's application on December 4th. Five days later, after an investigation to verify the information, he informed the trial court and defense counsel of the application and the fact that its existence was known to attorneys in his office at some time before the conclusion of the trial. Respondent's attorney then moved to set aside the verdict.

At the hearing before the trial judge, Justice Harold Birns, the prosecuting attorneys explained their decision not to disclose the application and Smith explained that he had seen nothing improper in submitting the application during the trial. Justice Birns, "[f]rom all the evidence adduced" at the hearing, 87 Misc. 2d, at 621, 384 N. Y. S. 2d, at 912, found that "Smith's letter was indeed an indiscretion" but that it "in no way reflected a premature conclusion as to the [respondent's] guilt, or prejudice against the [respondent], or an inability to consider the guilt or innocence of the [respondent]

---

his *voir dire*, Smith stated that he intended to pursue a career in law enforcement and that he had applied for employment with a federal drug enforcement agency. He also disclosed that his wife was interested in law enforcement, an interest which arose out of an incident in which she was assaulted and seriously injured. Smith stated that he had previously worked as a store detective for Bloomingdale's Department Store, and, in that capacity, had made several arrests which led to contact with the District Attorney's Office. In response to close inquiry by defense counsel, Smith declared his belief that he could be a fair and impartial juror in the case. This assurance apparently satisfied defense counsel, for Smith was permitted to take his seat among the jurors even though the defense had several unused peremptory challenges.

solely on the evidence." *Id.*, at 627, 384 N. Y. S. 2d, at 915. With respect to the conduct of the prosecuting attorneys, Justice Birns found "no evidence" suggesting "a sinister or dishonest motive with respect to Mr. Smith's letter of application." *Id.*, at 618–619, 384 N. Y. S. 2d, at 910.

## B

In his application for federal habeas relief, respondent contended that he had been denied due process of law under the Fourteenth Amendment to the United States Constitution by Smith's conduct. The District Court found insufficient evidence to demonstrate that Smith was actually biased. 485 F. Supp., at 1371. Nonetheless, the court imputed bias to Smith because "the average man in Smith's position would believe that the verdict of the jury would directly affect the evaluation of his job application." *Id.*, at 1371–1372. Accordingly, the court ordered respondent released unless the State granted him a new trial within 90 days.

The United States Court of Appeals for the Second Circuit affirmed by a divided vote. The court noted that "it is at best difficult and perhaps impossible to learn from a juror's own testimony after the verdict whether he was in fact 'impartial,'" but the court did not consider whether Smith was actually or impliedly biased. 632 F. 2d, at 1022. Rather, the Court of Appeals affirmed respondent's release simply because "the failure of the prosecutors to disclose their knowledge denied [respondent] due process." *Ibid.* The court explained: "To condone the withholding by the prosecutor of information casting substantial doubt as to the impartiality of a juror, such as the fact that he has applied to the prosecutor for employment, would not be fair to a defendant and would ill serve to maintain public confidence in the judicial process." *Id.*, at 1023.[5]

---

[5] This conclusion was based upon the majority's reading of our decision in *United States* v. *Agurs*, 427 U. S. 97 (1976), a reading by which it concluded that due process is violated when the prosecutor's actions treat a

## II

In argument before this Court, respondent has relied primarily on reasoning adopted by the District Court.[6] He contends that a court cannot possibly ascertain the impartiality of a juror by relying solely upon the testimony of the juror in question. Given the human propensity for self-justification, respondent argues, the law must impute bias to jurors in Smith's position. We disagree.

This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. For example, in *Remmer* v. *United States*, 347 U. S. 227 (1954), a juror in a federal criminal trial was approached by someone offering money in exchange for a favorable verdict. An FBI agent was assigned to investigate the attempted bribe, and the agent's report was reviewed by the trial judge and the prosecutor without disclosure to defense counsel. When they learned of the incident after trial, the defense attorneys moved that the verdict be vacated, alleging that "they would have moved for a mistrial and requested that the juror in question be replaced by an alternate juror" had the incident been disclosed to them during trial. *Id.*, at 229.

This Court recognized the seriousness not only of the attempted bribe, which it characterized as "presumptively prejudicial," but also of the undisclosed investigation, which was "bound to impress the juror and [was] very apt to do so

---

defendant unfairly or impugn the integrity of the judicial process, even if the defendant is not thereby prejudiced. 632 F. 2d 1019, 1023 (1980). As will be seen in Part III of this opinion, the Court of Appeals misread *Agurs*.

[6] Respondent may, of course, defend the judgment below on any ground which the law and the record permit, provided the asserted ground would not expand the relief which has been granted. *United States* v. *New York Telephone Co.*, 434 U. S. 159, 166, n. 8 (1977); *Dandridge* v. *Williams*, 397 U. S. 471, 475, n. 6 (1970); *Ryerson* v. *United States*, 312 U. S. 405, 408 (1941).

unduly." *Ibid.* Despite this recognition, and a conviction that "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions," *ibid.*, the Court did not require a new trial like that ordered in this case. Rather, the Court instructed the trial judge to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a *hearing* with all interested parties permitted to participate." *Id.*, at 230 (emphasis added). In other words, the Court ordered precisely the remedy which was accorded by Justice Birns in this case.

Even before the decision in *Remmer*, this Court confronted allegations of implied juror bias in *Dennis* v. *United States*, 339 U. S. 162 (1950). Dennis was convicted of criminal contempt for failure to appear before the Committee on Un-American Activities of the House of Representatives. He argued that the jury which convicted him, composed primarily of employees of the United States Government, was inherently biased because such employees were subject to Executive Order No. 9835, 3 CFR 627 (1943–1948 Comp.), which provided for their discharge upon reasonable grounds for belief that they were disloyal to the Government. Dennis contended that such employees would not risk the charge of disloyalty or the termination of their employment which might result from a vote for acquittal. The Court rejected this claim of implied bias, noting that Dennis was "free to show the existence of actual bias" but had failed to do so. 339 U. S., at 167. The Court thus concluded: "A holding of implied bias to disqualify jurors because of their relationship with the Government is no longer permissible. . . . Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Id.*, at 171–172. See also *Frazier* v. *United States*, 335 U. S. 497 (1948); *United States* v. *Wood*, 299 U. S. 123 (1936).

Our decision last Term in *Chandler* v. *Florida*, 449 U. S. 560 (1981), also treated a claim of implied juror bias. Appellants in *Chandler* were convicted of various theft crimes at a

jury trial which was partially televised under a new Canon of Judicial Ethics promulgated by the Florida Supreme Court. They claimed that the unusual publicity and sensational courtroom atmosphere created by televising the proceedings would influence the jurors and preclude a fair trial. Consistent with our previous decisions, we held that "the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *Id.*, at 575. Because the appellants did "not [attempt] to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them," we refused to set aside their conviction. *Id.*, at 581.

These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.[7]

---

[7] Respondent correctly notes that determinations made in *Remmer*-type hearings will frequently turn upon testimony of the juror in question, but errs in contending that such evidence is inherently suspect. As we said in *Dennis* v. *United States*, 339 U. S. 162 (1950), "[o]ne may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.*, at 171. See also *United States* v. *Reid*, 12 How. 361, 366 (1852).

The District Court and the Court of Appeals disregarded this doctrine: they held that a post-trial hearing comporting with our decisions in *Remmer* and other cases prosecuted in the *federal* courts was constitutionally insufficient in a state court under the Due Process Clause of the Fourteenth Amendment. It seems to us to follow "as the night the day" that if in the federal system a post-trial hearing such as that conducted here is sufficient to decide allegations of juror partiality, the Due Process Clause of the Fourteenth Amendment cannot possibly require more of a state court system.[8]

Of equal importance, this case is a federal habeas action in which Justice Birns' findings are presumptively correct under 28 U. S. C. § 2254 (d). We held last Term that federal courts in such proceedings must not disturb the findings of state courts unless the federal habeas court articulates some basis for disarming such findings of the statutory presumption that they are correct and may be overcome only by convincing evidence. *Sumner* v. *Mata*, 449 U. S. 539, 551 (1981). Here neither the District Court nor the Court of Appeals took issue with the findings of Justice Birns.

## III

As already noted, the Court of Appeals did not rely upon the District Court's imputation of bias. Indeed, it did not even reach the question of juror bias, holding instead that the prosecutors' failure to disclose Smith's application, without more, violated respondent's right to due process of law. Respondent contends that the Court of Appeals thereby cor-

---

[8] In connection with his argument that due process was denied by the prosecutors' withholding of Smith's application, respondent notes that had the prosecutors disclosed the application, the trial court could have replaced Smith with an alternate juror. Thus, respondent argues, not only was the prosecutors' action itself a denial of due process, but it also prevented respondent from availing himself of the process available under New York law for correcting juror bias. See N. Y. CPL § 270.35 (McKinney 1971). This argument proves too much. If the hearing and deter-

rectly preserved "the appearance of justice." Brief for Respondent 7. This contention, too, runs contrary to our decided cases.

Past decisions of this Court demonstrate that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. In *Brady* v. *Maryland*, 373 U. S. 83 (1963), for example, the prosecutor failed to disclose an admission by a participant in the murder which corroborated the defendant's version of the crime. The Court held that a prosecutor's suppression of requested evidence "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, at 87. Applying this standard, the Court found the undisclosed admission to be relevant to punishment and thus ordered that the defendant be resentenced. Since the admission was not material to guilt, however, the Court concluded that the trial itself complied with the requirements of due process despite the prosecutor's wrongful suppression.[9] The Court thus recognized that the aim of due process "is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Ibid.*

This principle was reaffirmed in *United States* v. *Agurs*, 427 U. S. 97 (1976). There, we held that a prosecutor must disclose unrequested evidence which would create a reasonable doubt of guilt that did not otherwise exist. Consistent

---

mination to replace a juror during trial would have adequately protected respondent's right to due process of law, and would not have been rendered impossible by necessary reliance on the juror's own testimony, we see no reason why a post-trial hearing and determination would be any less protective or possible.

[9] As we said of *Brady* in *United States* v. *Agurs*, 427 U. S., at 106: "[T]he confession could not have affected the outcome on the issue of guilt but could have affected Brady's punishment. It was material on the latter issue but not on the former. And since it was not material on the issue of guilt, the entire trial was not lacking in due process."

with *Brady*, we focused not upon the prosecutor's failure to disclose, but upon the effect of nondisclosure on the trial:

> "Nor do we believe the constitutional obligation [to disclose unrequested information] is measured by the moral culpability, or willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. Conversely, if evidence actually has no probative significance at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." 427 U. S., at 110 (footnote and citation omitted).[10]

In light of this principle, it is evident that the Court of Appeals erred when it concluded that prosecutorial misconduct alone requires a new trial. We do not condone the conduct of the prosecutors in this case. Nonetheless, as demonstrated in Part II of this opinion, Smith's conduct did not impair his ability to render an impartial verdict. The trial judge expressly so found. 87 Misc. 2d, at 627, 384 N. Y. S. 2d, at 915.

---

[10] Even in cases of egregious prosecutorial misconduct, such as the knowing use of perjured testimony, we have required a new trial only when the tainted evidence was material to the case. See *Giglio* v. *United States*, 405 U. S. 150, 154 (1972); *Napue* v. *Illinois*, 360 U. S. 264, 272 (1959). This materiality requirement implicitly recognizes that the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes.

We note, of course, that nothing in this case suggests that the prosecutors' conduct was undertaken in bad faith. As the trial court found, "there is no evidence which to any degree points to a conclusion that any member of the District Attorney's staff, . . . or any court officer, had a sinister or dishonest motive with respect to Mr. Smith's letter of application, or sought to gain thereby an unfair advantage over the defendant." 87 Misc. 2d, at 618–619, 384 N. Y. S. 2d, at 910.

Therefore, the prosecutors' failure to disclose Smith's job application, although requiring a post-trial hearing on juror bias, did not deprive respondent of the fair trial guaranteed by the Due Process Clause.

## IV

A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution. As we said in *Cupp* v. *Naughten*, 414 U. S. 141, 146 (1973):

> "Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [State's action] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."

Absent such a constitutional violation, it was error for the lower courts in this case to order a new trial. Even if the Court of Appeals believed, as the respondent contends, that prosecutorial misbehavior would "reign unchecked" unless a new trial was ordered, it had no authority to act as it did. Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension. *Chandler* v. *Florida*, 449 U. S., at 570, 582–583; *Cupp* v. *Naughten, supra,* at 146. No such wrongs occurred here. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE O'CONNOR, concurring.

I concur in the Court's opinion, but write separately to express my view that the opinion does not foreclose the use of "implied bias" in appropriate circumstances.

## I

Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an inter-

est in concealing his own bias and partly because the juror may be unaware of it. The problem may be compounded when a charge of bias arises from juror misconduct, and not simply from attempts of third parties to influence a juror.

Nevertheless, I believe that in most instances a postconviction hearing will be adequate to determine whether a juror is biased. A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case.

I am concerned, however, that in certain instances a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice. While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of "no bias," the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances.*

---

*In the exceptional situations that may require application of an "implied bias" doctrine, the lower federal courts need not be deterred by 28 U. S. C. § 2254(d), which provides that in a federal habeas proceeding "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . , evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear . . .

## II

None of our previous cases preclude the use of the conclusive presumption of implied bias in appropriate circumstances. *Remmer* v. *United States*, 347 U. S. 227 (1954), on which the Court heavily relies, involved not juror misconduct, but the misconduct of a third party who attempted to bribe a juror. Under those circumstances, where the juror has not been accused of misconduct or has no actual stake in the outcome of the trial, and thus has no significant incentive to shield his biases, a postconviction hearing could adequately determine whether or not the juror was biased. In *Dennis* v. *United States*, 339 U. S. 162 (1950), the Court rejected a claim that a juror's employment with the Federal Government was a ground to find implied bias, but did not foreclose a finding of implied bias in more serious situations. Justice Reed, who concurred in the Court's opinion, wrote that he read "the Court's decision to mean that Government employees may be barred for implied bias when circumstances are properly brought to the court's attention which convince the court that Government employees would not be suitable jurors in a particular case." *Id.*, at 172–173.

Moreover, this Court has used implied bias to reverse a conviction. In *Leonard* v. *United States*, 378 U. S. 544 (1964) *(per curiam)*, the Court held that prospective jurors who had heard the trial court announce the defendant's guilty

---

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

.     .     .     .     .

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding. . . ."

In those extraordinary situations involving implied bias, state-court proceedings resulting in a finding of "no bias" are by definition inadequate to uncover the bias that the law conclusively presumes.

verdict in the first trial should be automatically disqualified from sitting on a second trial on similar charges.

### III

Because there may be circumstances in which a postconviction hearing will not be adequate to remedy a charge of juror bias, it is important for the Court to retain the doctrine of implied bias to preserve Sixth Amendment rights. I read the Court's opinion as not foreclosing the use of implied bias in appropriate situations, and, therefore, I concur.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

Juror John Smith vigorously pursued employment with the office of the prosecutor throughout the course of his jury service in respondent's state criminal trial. The prosecutors learned of Smith's efforts during the trial, but improperly failed to disclose this information until after the jury had returned a verdict of guilty against respondent. The state court conducted a post-trial evidentiary hearing and determined that the juror was not actually biased. Thus, it ruled that respondent was not prejudiced, and refused to set aside the conviction. Respondent subsequently filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York, claiming that he was denied his constitutional right to an impartial jury. The District Court ruled that the conviction should be set aside, and the United States Court of Appeals for the Second Circuit affirmed. A majority of this Court now reverses, holding that the post-trial evidentiary hearing provided sufficient protection to respondent's right to an impartial jury. Because I find the majority's analysis completely unpersuasive, I dissent.

### I

The right to a trial by an impartial jury lies at the very heart of due process. *Irvin* v. *Dowd*, 366 U. S. 717, 721–722

(1961).[1]  "[O]ur common-law heritage, our Constitution, and our experience in applying that Constitution have committed us irrevocably to the position that the criminal trial has one well-defined purpose—to provide a fair and reliable determination of guilt."  *Estes* v. *Texas*, 381 U. S. 532, 565 (1965) (Warren, C. J., with whom Douglas and Goldberg, JJ., joined, concurring).  That purpose simply cannot be achieved if the jury's deliberations are tainted by bias or prejudice.  Fairness and reliability are assured only if the verdict is based on calm, reasoned evaluation of the evidence presented at trial.  Thus, time and time again, in a broad variety of contexts, the Court has adopted strong measures to protect the right to trial by an impartial jury.

The Court has insisted that defendants be given a fair and meaningful opportunity during *voir dire* to determine whether prospective jurors are biased—even if they have no specific prior knowledge of bias.  In *Ham* v. *South Carolina*, 409 U. S. 524 (1973), the Court held that a trial court may not deny a Negro defendant the opportunity to question prospective jurors on the subject of racial prejudice when the circumstances suggest the need for such questioning.  Even when questions about racial prejudice are not required, a generalized and thorough inquiry into prejudice is necessary. *Ristaino* v. *Ross*, 424 U. S. 589 (1976).

---

[1] In *Irvin* v. *Dowd*, the Court stated:

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process.  *In re Oliver*, 333 U. S. 257; *Tumey* v. *Ohio*, 273 U. S. 510.  'A fair trial in a fair tribunal is a basic requirement of due process.'  *In re Murchison*, 349 U. S. 133, 136.  In the ultimate analysis, only the jury can strip a man of his liberty or his life.  In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworn.'  Co. Litt. 155b.  His verdict must be based upon the evidence developed at the trial.  Cf. *Thompson* v. *City of Louisville*, 362 U. S. 199.  This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies."  366 U. S., at 722.

The Court has also insisted that the jury be selected from a representative cross-section of the community. Selection procedures that exclude significant portions of the population, and thus increase the risk of bias, are invalid. For example, in *Peters* v. *Kiff*, 407 U. S. 493 (1972), the Court invalidated a selection procedure that resulted in the systematic exclusion of Negroes.[2] Similarly, in *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), the Court struck down a state rule excluding women from compulsory jury service.[3] And in *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), the Court ruled that a defendant in a capital case was denied his right to an impartial jury on the issue of sentence when the trial judge automatically excluded jurors who had scruples against capital punishment.

The right to a jury drawn from a fair cross-section of the community extends even to defendants who are not members of the excluded class. In *Peters* v. *Kiff, supra*, the defendant challenging the exclusion of blacks was white; in *Taylor* v. *Louisiana, supra*, the defendant challenging the exclusion of women was male. Exclusion is impermissible, not simply because jurors who are not members of the defendant's class may be prejudiced against the defendant, but also because the jury would be deprived of "a perspective on human events that may have unsuspected importance in any case that may be presented." *Peters* v. *Kiff, supra,* at 503–504 (opinion announcing judgment). See also *Taylor* v. *Louisiana, supra*, at 531.[4]

---

[2] In *Peters* v. *Kiff*, the opinion announcing the judgment of the Court stated that such procedures were unacceptable even when there is no proof of actual bias. 407 U. S., at 504 (MARSHALL, J., joined by Douglas and Stewart, JJ.). The opinion explained that actual bias is virtually impossible to prove. *Ibid.* Thus, it is necessary to "decide on principle which side shall suffer the consequences of unavoidable uncertainty." *Ibid.* Given the great potential for harm, and the importance of the right to an impartial jury, doubts should be resolved in favor of the defendant. *Ibid.*

[3] See also *Ballard* v. *United States*, 329 U. S. 187 (1946).

[4] In *Taylor* v. *Louisiana*, the Court stated that " 'a flavor, a distinct quality is lost if either sex is excluded,' " and that " 'exclusion of one may indeed

The Court has also acted to protect defendants from the possibility that jurors might be prejudiced by extensive pretrial publicity. In *Rideau* v. *Louisiana*, 373 U. S. 723 (1963), it ruled that the trial court should have granted a request for a change in venue, when the entire community had seen the defendant confess to the crime in a police interrogation broadcast on television. The Court did not require a particularized showing that the confession actually prejudiced the jurors against the defendant. Later, in *Irvin* v. *Dowd*, 366 U. S. 717 (1961), the Court reversed a conviction where widespread and inflammatory publicity had preceded the trial, even though each of the jurors had insisted that he would remain impartial.

Similarly, the Court has stated that defendants must be protected from the impact on jurors of publicity during trial. Although an absolute constitutional ban on news coverage of trials by the print or broadcast media cannot be justified, the defendant must be given an opportunity to demonstrate that the media's coverage of his case compromised the ability of the particular jury that heard the case to weigh the evidence fairly. *Chandler* v. *Florida*, 449 U. S. 560, 575 (1981); see also *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539, 563–565 (1976); *Estes* v. *Texas, supra.*

The Court has guarded against other conduct by third parties that might affect the jury's impartiality. In *Remmer* v. *United States*, 347 U. S. 227 (1954), it ruled that any communication with a juror during a trial about the matter pending before the jury "is, for obvious reasons, deemed presumptively prejudicial." *Id.*, at 229. Although this presumption is not conclusive, "the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Ibid.* See also *Turner* v. *Louisiana*, 379 U. S. 466 (1965) (jury could not try a case after it had been placed

make the jury less representative of the community than would be true if an economic or racial group were excluded.'" 419 U. S., at 532 (quoting *Ballard* v. *United States, supra*, at 194).

in protective custody of deputy sheriffs who had been the principal prosecution witnesses, even though jurors might not have been influenced by the association).

To summarize, the Court has required inquiry into prejudice even when there was no evidence that a particular juror was biased; has regarded the absence of a balanced perspective, and not simply the existence of bias against defendant, as a cognizable form of prejudice; has not always required a particularized showing of prejudice; and has strongly presumed that contact with a juror initiated by a third party is prejudicial. In this case, where there was evidence that juror Smith had a serious conflict of interest, and where that conflict would inevitably distort his perspective on the case, the majority nevertheless holds that the juror's simple assertion, after the verdict, that he was not biased sufficiently protects respondent's right to trial by an impartial jury. This holding is utterly inconsistent with the Court's historical recognition of this "most priceless" right. *Irvin, supra,* at 721.

## II

### A

The majority concedes the importance of the right to a trial by an impartial jury. It claims, however, that respondent's right was adequately protected here, because the state trial judge conducted a postverdict evidentiary hearing and concluded that Smith was not actually biased. According to the majority, the Constitution requires only that the defendant be given an opportunity to prove actual bias. Indeed, it would apparently insist on proof of actual bias, not only when a juror had applied for employment with the prosecutor's office, but also when the juror was already employed in the prosecutor's office, or when he served as a prosecuting attorney. The majority relies on the premise that an evidentiary hearing provides adequate assurance that prejudice does not exist. This premise, however, ignores basic human psychology. In cases like this one, an evidentiary hearing can never adequately protect the right to an impartial jury.

Despite the majority's suggestions to the contrary, juror Smith was not a passive, indifferent job applicant.[5] He began pursuing employment as an investigator in the Office of the District Attorney on September 23, 1974, the same day he was sworn in. He asked a friend, Criminal Court Officer Rudolph Fontaine, to determine the proper method of applying for employment. Once he had completed his application, he gave it to Fontaine for hand delivery to the District Attorney's Office, apparently because he assumed that the court officer had a personal contact in the office. In addition, after the application had been filed, he met regularly with Fontaine and Jury Warden Mario Piazza in order to determine the progress of his application. On November 21, 1974, the jury returned a verdict of guilt and the trial ended. The very next day, Smith phoned the District Attorney's Office to check on the status of his application. When he was unable to get in touch with anyone who knew about his application, he asked his former supervisor to make inquiries in his behalf.

When a juror vigorously and actively pursues employment in the prosecutor's office throughout the course of a trial, the probability of bias is substantial. This bias may be conscious, part of a calculated effort to obtain a job. The juror may believe that his application will be viewed favorably if the defendant is found guilty. Thus, he may decide to vote for a verdict of guilty regardless of the evidence, and he may attempt to persuade the other jurors that acquittal is not justified. There is also a very serious danger of unconscious bias. Only individuals of extraordinary character would not be affected in some way by their interest in future employ-

---

[5] The majority notes that during *voir dire*, the defense chose not to challenge Smith, even though he had stated that he had a strong interest in a law enforcement career. *Ante*, at 212–213, n. 4. However, since the defendant was himself a law enforcement officer, such an interest would not necessarily have been unfavorable to the defense. I think it clear that a general career interest in law enforcement is very different from an application for a job with the prosecutor in a particular case.

ment. Subconsciously, the juror may tend to favor the prosecutor simply because he feels some affinity with his potential employer. Indeed, the juror may make a sincere effort to remain impartial, and yet be unable to do so.

Not only is the probability of bias high, it is also unlikely that a post-trial evidentiary hearing would reveal this bias. As the Court of Appeals stated, given the human propensity for self-justification, it is very difficult "to learn from a juror's own testimony after the verdict whether he was in fact 'impartial.'" 632 F. 2d 1019, 1022 (CA2 1980). Certainly, a juror is unlikely to admit that he had consciously plotted against the defendant during the course of the trial. Such an admission would have subjected juror Smith to criminal sanctions.[6] It would also have damaged his prospects for a career in law enforcement. A law enforcement agency is unlikely to hire an investigator whose credibility could always be impeached by an admission that he had disregarded his juror's oath in a criminal trial.

Even when the bias was not part of an affirmative course of misconduct, however, but was unconscious, a juror is unlikely to admit that he had been unable to weigh the evidence fairly. If he honestly believes that he remained impartial throughout the trial, no amount of questioning will lead to an admission. Rather, the juror will vehemently deny any accusations of bias.[7]

In the past, the Court has recognized that the question whether a juror is prejudiced poses substantial problems of proof.

---

[6] If Smith were found to have engaged in a course of conscious misconduct, he might have been prosecuted under N. Y. Penal Law § 195.05 (obstructing governmental administration); § 215.20 (bribe receiving by a juror); or § 215.20 (misconduct by a juror) (McKinney 1975). He might also have been found guilty of criminal contempt. See § 215.20.

[7] The petitioner emphasizes that during the evidentiary hearing, the trial judge had an opportunity to observe the juror's demeanor. Thus, argues the petitioner, even where the juror denies that he was biased, the trial judge will be able to measure the juror's integrity, and decide whether

> "Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence." *Crawford* v. *United States*, 212 U. S. 183, 196 (1909).

Similarly, in *Irvin* v. *Dowd*, 366 U. S., at 728, the Court stated that although a juror may be sincere when he says that he was fair and impartial to the defendant, the "psychological impact requiring such a declaration before one's fellows is often its father." And in *Peters* v. *Kiff*, the opinion announcing the judgment stated: "It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce." 407 U. S., at 504 (MARSHALL, J., joined by Douglas and Stewart, JJ.).

I believe that in cases like this one, where the probability of bias is very high, and where the evidence adduced at a hearing can offer little assurance that prejudice does not exist, the juror should be deemed biased as a matter of law. Specifically, where a juror pursues employment with the office of the prosecutor, under circumstances highly suggestive of misconduct or conflict of interest, bias should be "implied," and he should be automatically disqualified, despite the absence of proof of actual bias. If the juror's efforts to secure employment are not revealed until after the trial, the conviction must be set aside.[*] The right to a trial by an impartial

---

to credit his claim that he fairly weighed the evidence. It may be true that the opportunity to observe the juror will be of assistance in some cases. However, it will be of little value where the juror honestly but falsely believes that he was impartial.

[*]Although the concurring opinion would not use an implied-bias rule in this case, it agrees that in some circumstances, such a rule is appropriate. It suggests, for example, that a finding of implied bias might be justified where "the juror is an actual employee of the prosecuting agency." *Ante,*

jury is too important, and the threat to that right too great, to justify rigid insistence on actual proof of bias. Such a requirement blinks reality.

B

Adoption of a conclusive presumption of bias in these limited circumstances would not be without precedent; such presumptions of juror bias have ancient historical roots. At English common law, prospective jurors could be challenged not only when the defendant could prove actual bias, but also when the circumstances were such that bias could be implied.[9] Blackstone states that exclusion of a prospective juror for implied bias is appropriate when it is shown:

> "that [he] is of kin to either party within the ninth degree; that he has been arbitrator on either side; that he has an interest in the cause; that there is an action pending between him and the party; that he has taken money for his verdict; that he has formerly been a juror in the same cause; that he is the party's master, servant, counsellor, steward, or attorney, or of the same society or corporation with him." 3 W. Blackstone, Commentaries 480–481 (W. Hammond ed. 1890).

at 222. In my view, it is impossible to draw meaningful distinction between a juror who is an actual employee of the prosecuting agency, and a juror who has applied for employment with that agency. Indeed, there may be a greater danger of bias where the juror is pursuing a job. An individual who has not yet obtained employment and who believes that his job prospects are at stake may be very anxious to please.

[9] In *United States* v. *Wood*, 299 U. S. 123 (1936), the Court described the common law regarding challenges to prospective jurors as follows:

"Challenges at common law were to the array, that is, with respect to the constitution of the panel, or to the polls, for disqualification of a juror. Challenges to the polls were either 'principal' or 'to the favor,' the former being upon grounds of absolute disqualification, the latter for actual bias." *Id.*, at 134–135.

See also 3 W. Blackstone, Commentaries 480–481 (W. Hammond ed. 1890).

Similarly, Bracton states that if the defendant "suspects any of the twelve jurors he may remove him for just cause . . . as where there are deadly enmities between some of them and the indicted man, or there is a greedy desire to get his land . . . ; if there is ground for suspicion all are to be removed, that the inquiry may proceed free from all doubts." 2 S. Thorne, Bracton on the Laws and Customs of England 405 (1968).

The States also employ rules of implied bias. Most jurisdictions have statutes that set forth conduct or status that will automatically disqualify prospective jurors, without regard to whether that person is actually biased. These statutes frequently exclude persons related to the prosecution, defense counsel, a witness, or the defendant.[10] The New York statute, which would have been applied here if juror Smith's intention to apply for a job had come to light during *voir dire*, is especially broad; it disqualifies any person who has a relationship to a party or witness to the action which is likely to preclude that person from rendering an impartial verdict. N. Y. Crim. Proc. Law § 270.20(1)(c) (McKinney 1971). This provision, added to the statute in 1971, calls for the application of an "average person" standard and does not require proof that the particular potential juror would be biased. See, *e. g.*, *People* v. *Provenzano*, 50 N. Y. 2d 420, 424, 407 N. E. 2d 408, 410 (1980).[11]

---

[10] See, *e. g.*, Cal. Penal Code Ann. § 1074 (West Supp. 1981); Idaho Code § 19-2020 (1979); Minn. Rule Crim. Proc. 26.02(5); N. Y. Crim. Proc. Law § 270.20(1) (McKinney 1971); N. D. Cent. Code § 29-17-36 (Supp. 1981); Okla. Stat., Tit. 22, § 660 (1971); Ore. Rev. Stat. § 136.220 (1979); S. D. Comp. Laws Ann. § 23A-20-13 (1979); Utah Code Ann. § 77-35-18(e) (1980).

[11] At the time of *voir dire*, Smith had not yet applied for a job with the office of the District Attorney. It seems likely, however, that if he had filed an application at this point, and this fact came to light during *voir dire*, he would have been automatically disqualified pursuant to N. Y. Crim. Proc. Law § 270.20(1)(c) (McKinney 1971).

234

Some state courts have also permitted challenges for implied bias on a case-by-case basis.[12]   In fact, at least one court has presumed bias in circumstances very similar to those presented here.   In *Haak* v. *State*, —— Ind. ——, 417 N. E. 2d 321 (1981), the Indiana Supreme Court held that a woman whose husband was offered a position on the prosecutor's staff on the day that she was selected as a juror in a rape case was impliedly biased.   The court stated that the juror's bias could not be "avoided or dissolved by admonitions from the court or by the juror's assertion that she believed she could judge the case impartially." *Id.*, at ——, 417 N. E. 2d, at 326.   It was unrealistic to "expect a juror in this situation to act with an even hand toward both parties." *Ibid.*   Thus, the trial judge erred in refusing to grant defendant's motion for a mistrial.[13]   See also *Tableporter* v. *Urist*, 157 Misc. 347, 283 N. Y. S. 350 (Mun. Ct. 1935) (conviction set aside where juror's son applied to defendant for a job).

Of course, the fact that many States employ rules of implied bias in situations similar to those presented here does not necessarily imply that such rules are constitutionally mandated.[14]   The widespread state practice does, however,

---

[12] See, *e. g.*, *State* v. *West*, 157 W. Va. 209, 210, 200 S. E. 2d 859, 861 (1973) (reversible error where trial court denies challenge for cause to juror who is employee of prosecutorial agency); *State* v. *Kokoszka*, 123 Conn. 161, 163, 193 A. 210, 211 (1937); *State* v. *Howard*, 17 N. H. 171 (1845), overruled on other grounds, *Shulinsky* v. *Boston & M. R. Co.*, 83 N. H. 86, 89, 139 A. 189, 191 (1927).

[13] Cf. *Block* v. *State*, 100 Ind. 357 (1885) (juror who is deputy prosecutor should be disqualified); *Barnes* v. *State*, 263 Ind. 320, 330 N. E. 2d 743 (1975) (juror whose relative is a member of the prosecutor's staff should be disqualified).

[14] A decision to endorse rules of implied bias would not lead to the constitutionalization of a wide variety of state disqualification rules.   As I stated above, I believe that an implied-bias rule is constitutionally mandated only when the probability of bias is particularly great, and when an evidentiary hearing is particularly unlikely to reveal that bias.   Measured against this standard, many state rules would not be constitutionally required.

support that conclusion. The States would not adopt such rules at the expense of their strong interest in efficiently procuring convictions if they were not committed to safeguarding the right to trial by an impartial jury, and if they did not believe that this right was seriously threatened.

## C

In concluding that an implied-bias rule is not appropriate, and that a post-trial evidentiary hearing is an adequate remedy, the majority relies heavily on this Court's decision in *Remmer* v. *United States*, 347 U. S. 227 (1954). The defendant in that case was being tried for income tax evasion. During the course of the trial, an unnamed person attempted to bribe a juror. The juror reported this incident to the trial judge, who asked the Federal Bureau of Investigation (FBI) to conduct an investigation. After interviewing the juror, the FBI concluded that the bribery attempt had been made "in jest," *id.*, at 228, and had not had a prejudicial impact. The trial judge decided not to take any action. The defense learned of the incident after the jury returned a verdict of guilty. It moved for a new trial, complaining that the bribery attempt and the FBI investigation were likely to have influenced the jury's deliberations. The Court held that any private communication with a juror during trial about the matter pending before the jury is presumptively prejudicial. It stated, however, that this presumption is not conclusive, and that the Government should be given an opportunity to show that the contact was harmless. The Court then remanded the case to the District Court with directions to hold a hearing to determine whether the incident was harmful, and if so, to grant a new trial.

According to the majority, *Remmer* establishes that a postverdict inquiry will always be the appropriate remedy where claims of jury prejudice are raised after the conclusion of the trial. The holding of *Remmer* is not nearly so broad, however. The Court did not purport to address instances of

serious juror misconduct in which bias could be implied. An examination of the facts of that case reveals that the danger of bias was much less substantial in that case than in this one. The defendant claimed only that the jury might have been influenced by the unsuccessful bribery attempt and the FBI investigation. There were no allegations that the jurors themselves were guilty of misconduct. Moreover, even if the jurors were influenced by the bribery attempt made "in jest" or the contact with the FBI, an evidentiary hearing was more likely to reveal that impact. A juror will be less reluctant to admit that he was disturbed or upset by the misconduct of a third party, than to admit that he himself acted improperly.

The majority also relies upon this Court's decisions in *Dennis* v. *United States*, 339 U. S. 162 (1950); *Frazier* v. *United States*, 335 U. S. 497 (1948); and *United States* v. *Wood*, 299 U. S. 123 (1936).[15] In these cases, the Court indicated that the fact that a juror was employed by the Federal Government did not by itself require a finding of implied bias in cases in which the Government was a party.[16] The Court was not persuaded by "vague conjectures" that Government employees are "peculiarly vulnerable" to a "miasma of fear," or are "so intimidated that they cringe before their Government in fear of investigation and loss of employment if they do their duty as jurors." *Dennis, supra,* at 172. However,

---

[15] It further relies on this Court's decision in *Chandler* v. *Florida*, 449 U. S. 560 (1981), which held that the appropriate safeguard against the possibility that news coverage of a defendant's trial influenced the jurors is the defendant's opportunity to show that the coverage compromised the ability of the jury to adjudicate fairly. However, that case certainly does not hold that automatic disqualification rules would never be appropriate.

[16] *United States* v. *Wood* upheld the constitutionality of a District of Columbia statute that permitted Federal Government employees to serve on juries in which the United States was a party. *Dennis* v. *United States* ruled that Government employees need not be excused from serving as jurors in the prosecution of the General Secretary of the Communist Party, U. S. A. *Frazier* v. *United States* refused to uphold a challenge to a jury that consisted entirely of Government employees.

these cases do not hold that an implied-bias rule would never be appropriate. In all three decisions the Court stressed that trial judges would retain power to safeguard the interests of the defendant where circumstances suggest a real danger of bias. This power surely includes the application of a *per se* rule where necessary. *Dennis, supra,* at 168; *Frazier, supra,* at 511; *Wood, supra,* at 150.[17]

Indeed, in *Leonard* v. *United States,* 378 U. S. 544 (1964) *(per curiam),* this Court explicitly endorsed the application of an implied-bias rule.[18] The petitioner in that case was con-

---

[17] There is language in each of the three opinions that might be interpreted to suggest that a hearing to determine actual bias will always be a sufficient remedy. See, *e. g., Dennis* v. *United States,* 339 U. S., at 171–172 ("[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury"); *Frazier* v. *United States,* 335 U. S., at 510 (in ordinary circumstances jurors are subject to challenge only for "actual bias"); *United States* v. *Wood,* 299 U. S., at 150 (courts should conduct full inquiry into "actual bias" where circumstances suggest such inquiry is appropriate). In these cases, however, the Court regarded "actual bias" as including "not only prejudice in the subjective sense but also such as might be thought implicitly to arise 'in view of the nature or circumstances of his employment, or of the relation of the particular governmental activity to the matters involved in the prosecution, or otherwise.'" *Frazier* v. *United States, supra,* at 510–511, n. 19 (quoting *United States* v. *Wood, supra,* at 133–134).

[18] Cf. *Tumey* v. *Ohio,* 273 U. S. 510, 532 (1927) (judge with financial interest in outcome is disqualified from hearing case, even though he might not actually have been affected by financial interest, because average man in that position would be subject to "possible temptation . . . not to hold the balance nice, clear and true between the State and the accused"); *In re Murchison,* 349 U. S. 133 (1955) (judge may not conduct grand jury inquiry and then adjudicate charges against defendant because his impartiality might reasonably be questioned); *Peters* v. *Kiff,* 407 U. S. 493 (1972) (opinion of MARSHALL, J., joined by Douglas and Stewart, JJ.) (possibility that jury selection procedures that exclude Negroes might result in bias against defendant is sufficient to justify invalidation of those procedures); see also n. 2, *supra.*

It is relevant to note that if a judge had an application pending with a litigant while he was trying a case, he would be presumed biased, no matter how vigorously he protested that he was actually impartial. See *Tumey, supra; Murchison, supra.*

victed in separate trials of forging Government checks and of transporting forged instruments in interstate commerce. The two cases were tried in succession. The jury in the first case announced its guilty verdict in open court in the presence of the jury panel from which the jurors who were to try the second case were selected. Petitioner objected, but the objection was overruled. This Court reversed, holding that prospective jurors who have sat in the courtroom and heard a verdict returned against an individual immediately prior to that individual's trial on a similar charge should be automatically disqualified.[19]

In short, this Court's cases do not establish that an automatic disqualification rule is never appropriate. To the contrary, *Leonard* reveals that the Court has employed such a rule in those limited circumstances presenting an unusually high probability that a juror is biased and a similarly high probability that a hearing will not reveal that bias.

## D

The majority also emphasizes that federal courts exercising habeas corpus jurisdiction must ordinarily defer to state-court findings of fact. It points to 28 U. S. C. § 2254(d),

---

[19] A number of lower federal courts have also suggested that implied-bias rules may be appropriate in some circumstances. See, *e. g., McCoy* v. *Goldston,* 652 F. 2d 654 (CA6 1981) (bias should be implied and new trial granted where juror conceals information that would have resulted in disqualification for cause); *United States* v. *Allsup,* 566 F. 2d 68, 71–72 (CA9 1977) (new trial should be granted in robbery trial where two of jurors worked for bank that had been robbed); *Deschenes* v. *United States,* 224 F. 2d 688 (CA10 1955) (dictum) (in some circumstances prejudice must be presumed and court, as matter of law, must grant a new trial); *Cavness* v. *United States,* 187 F. 2d 719 (CA5 1951) (dictum) (same). See also *United States* v. *Kyle,* 152 U. S. App. D. C. 141, 145, 469 F. 2d 547, 551 (1972) (Bazelon, J., dissenting) (defendant claims that juror who had been castigated by judge when serving as a juror in another trial would be prejudiced against him; "[a] Procrustean demand for a showing of prejudice is ill-suited to a case where the very integrity of the judicial process is at stake and where the inability to demonstrate prejudice offers little assur-

which provides that state-court factfinding should be presumed correct. Of course, federal courts have limited power of review in habeas corpus proceedings. I think it clear, however, that deference is not appropriate under the circumstances of this case.

As I have already explained, I do not believe that it was possible for the state court to determine, on the basis of an evidentiary hearing, whether Smith was biased. The state factfinding was inherently unreliable. Section 2254(d) recognizes that deference is not appropriate in such cases. It provides that the presumption in favor of state factfinding may be overcome when "the applicant did not receive a full, fair, and adequate hearing in the state court proceeding," or when "he was otherwise denied due process of law." §§ 2254(d)(6), (7). The evidentiary hearing conducted here was not fair and adequate. Furthermore, because the hearing could not protect sufficiently the right to an impartial jury, respondent was denied due process. Under the circumstances, § 2254(d) does not bar review of the state-court decision.

## III

I would also affirm the decision of the Court of Appeals on an alternative ground. Respondent was prejudiced by the

---

ance that prejudice did not exist"), cert. denied, 409 U. S. 1117 (1973). But see *United States* v. *Brown*, 644 F. 2d 101, 104–105 (CA2 1981) (court refuses to "'create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where . . . there is no showing of actual bias or prejudice'") (quoting *Mikus* v. *United States*, 433 F. 2d 719, 724 (CA2 1970)).

Almost 200 years ago, in *United States* v. *Burr*, 25 Fed. Cas. 49, 50 (No. 14,692g) (CC Va. 1807), Chief Justice Marshall indicated that he believed implied-bias rules were appropriate in some circumstances. A person "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it supposes prejudice, because in general persons in a similar situation would feel prejudice." *Ibid.*

prosecutors' failure to disclose during the trial their knowledge that juror Smith had applied for a job with the Office of the District Attorney. If the prosecutors had informed the court in a timely fashion, an alternate juror would almost certainly have been selected, thus ending any danger of bias.

The prosecutors' conduct in withholding the information was clearly improper. At the evidentiary hearing, they claimed that they failed to disclose the fact that Smith had applied for a job with their office in part because they were caught up in preparations for the final stages of trial. This explanation is not convincing. At the close of the evidence, the prosecutors revealed that another juror, Bethel, had been arrested on a narcotics charge prior to trial and had agreed to cooperate with the District Attorney's Office in exchange for dismissal of the charges. After this disclosure, and an *in camera* hearing, the parties consented to the discharge of this juror, and his replacement by one of four alternates. The fact that the prosecutors were willing to disclose information concerning Bethel suggests that they failed to reveal Smith's conduct, not because of time pressures, but because they believed that Smith's presence on the jury would be valuable.[20] Even the petitioner now concedes that the prosecutors should have informed the trial judge and the defense as soon as they learned of Smith's application, and that their failure to do so was inexcusable.

The majority argues that prosecutorial misconduct, by itself, is not sufficient to justify reversal of a conviction in ha-

---

[20] The state trial judge, the District Court, and the Court of Appeals all condemned the prosecuting attorneys' conduct. The trial judge stated that the failure to inform the court and defense counsel of Smith's application was "a serious error in judgment," *People* v. *Phillips*, 87 Misc. 2d 613, 628, 384 N. Y. S. 2d 906, 916 (1975), and "unique misjudgment," *id.*, at 631, 384 N. Y. S. 2d, at 918. See also 485 F. Supp. 1365, 1369–1370 (SDNY 1980); 632 F. 2d 1019, 1023 (CA2 1980).

beas corpus proceedings.[21]   It relies primarily on this Court's decisions in *United States* v. *Agurs*, 427 U. S. 97, 110, 112 (1976), and *Brady* v. *Maryland*, 373 U. S. 83, 87, 92 (1963), which suggest that the constitutional obligation to disclose material evidence is not measured simply by the moral culpability of the prosecutor, and that relief is ordinarily appropriate only when the defendant was prejudiced by the prosecutor's actions.[22]   Even if the majority is correct in holding that prejudice is also required where the prosecutor fails to disclose information suggesting that a juror might be biased, I think it clear that respondent was prejudiced here.   If the fact that Smith had applied for a job had been promptly disclosed, respondent's jury trial right could have been protected.

If disclosure had been made during trial, the parties might simply have agreed that Smith should be replaced with one of

---

[21] The majority also points out that federal courts do not have supervisory power over state courts, and that as a result, habeas corpus review of a state-court conviction based on prosecutorial misconduct must focus on possible due process violations.   See *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 642 (1974).

[22] Depending on the nature of the prosecutor's misconduct, the prejudice requirement may be easily satisfied.   If the prosecutor knowingly presents perjured testimony, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.   *United States* v. *Agurs*, 427 U. S., at 103–104. After all, presentation of perjured testimony is "a corruption of the truth-seeking function of the trial process."   *Id.*, at 104.   Where the prosecutor fails to comply with a request for specific evidence, and if there is a substantial basis for claiming that the evidence was material, the failure to disclose is rarely excused.   *Brady* v. *Maryland*, 373 U. S., at 87.   The defendant faces a substantial burden only if the prosecutor fails to disclose material evidence, when no specific request for the evidence was ever made.   In this circumstance, the verdict may be set aside if the evidence creates a reasonable doubt that did not otherwise exist.   *United States* v. *Agurs, supra,* at 112.

the alternates. Such an agreement was reached with respect to juror Bethel. The trial judge might also have exercised his power under N. Y. Crim. Proc. Law § 270.35 (McKinney 1971), which provides that "[i]f at any time after the trial jury has been sworn and before its rendition of a verdict the court is satisfied, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve . . . , or that a juror has engaged in misconduct of a substantial nature . . . , the court may, if an alternative juror . . . is available for service, discharge such trial juror and order that he be replaced."[23]  Both of these simple remedies would have eliminated the possibility of juror bias.

At the very least, as the trial judge himself stated, if disclosure had been made during trial he would have conducted a hearing to determine whether Smith had engaged in misconduct or whether he was actually biased. As I have already suggested, I have serious doubts whether an evidentiary hearing of this nature could ever be reliable. However, a hearing during trial is far more likely to reveal evidence of bias than a post-trial hearing. The pressures on a juror in Smith's position would be much less substantial. After trial, he would have to admit that he had been unable to obey his oath as a juror, and that he had been unfair in evaluating the evidence. During trial, on the other hand, he would only have to state that his pending application for a job with the prosecutor's office might affect his ability to weigh the evidence fairly.

Just as important, the pressures on the judge are much less substantial where the hearing is held during the course of a trial. During trial, if the judge finds that a juror is biased, he can simply replace the juror with an alternate.

---

[23] The failure to disclose possible juror bias can be analogized to a prosecutor's knowing use of perjured testimony. Both forms of prosecutorial misconduct result in corruption of the truth-seeking function of the trial process.  See *United States* v. *Agurs, supra,* at 105; see also n. 20, *supra.* Thus, in this context also, the conviction should be set aside if there is any

After trial, if actual bias is found, the only remedy is to set aside the conviction and begin a new trial. Any judge would hesitate before taking such action. The pressures must have been particularly great in this case. Respondent was first tried in 1972. When the jury was unable to reach a verdict, a mistrial was declared. Respondent's second trial did not begin until two years later. The second trial lasted nine weeks, and 44 witnesses were called to testify. Under these circumstances, where a third trial would have led to even more expense and delay, a judge would be reluctant to set aside the conviction.

In short, if the prosecutors had not withheld the information about Smith's job application, it is quite likely that Smith would have been excused and replaced with an alternate. If a replacement had been made, the substantial danger of juror bias would have been eliminated. Thus, under the circumstances, respondent was prejudiced by the prosecutors' misconduct. Given the existence of this prejudice, and the fundamental importance of the right to an impartial jury, I would set aside the conviction.

The limited power of federal courts in habeas corpus proceedings poses no obstacle to this conclusion. Although the trial judge found during a post-trial hearing that Smith was not actually biased, deference to state-court factfinding is not required where the evidentiary hearing on which the factfinding is based is inherently unreliable. See *supra*, at 238–239. The prosecutors' misconduct in this case deprived respondent of a hearing during trial, and of the opportunity to substitute an alternate juror. Where the prosecutors' conduct acted to deprive respondent of this alternative, the State cannot, consistent with due process, relegate respondent's right to an impartial jury to a belated, inadequate post-trial hearing.

---

reasonable likelihood that the material omission could have affected the judgment of the jury. See 427 U. S., at 103–104; n. 20, *supra*. Here, clearly, such a reasonable likelihood does exist.

## IV

The majority adopts a completely unrealistic view of the efficacy of a post-trial hearing, and thus fails to accord any meaningful protection to the right to an impartial jury, one of the most valuable rights possessed by criminal defendants. I would affirm the judgment of the Court of Appeals on the ground that a juror who applies for employment with the office of the prosecutor and vigorously pursues that employment throughout the course of the trial is impliedly biased. I would also affirm on the alternative ground that the prosecutors improperly failed to disclose during trial that the juror applied for a job, thereby prejudicing respondent by depriving him of the opportunity to substitute an unbiased alternate juror.

The majority concedes that due process means an unbiased jury, "capable and willing to decide the case solely on the evidence." *Ante*, at 217. All respondent has asked for is the opportunity to be tried by such a jury. If the prosecutors had taken the simple step of informing the trial judge that Smith had applied for employment with their office, Smith could have been replaced, and respondent would have received an opportunity to be tried by an impartial jury. Because the prosecutors intentionally failed to do so, however, a juror who was almost certainly prejudiced against respondent participated in the deliberations. If due process really does mean a full and fair opportunity to be tried by an unbiased jury, "capable and willing to decide the case solely on the evidence"—then in this case, due process has been denied.